THOMAS P. DUNNE, APPELLEE, v. MARTHA F. DUNNE, APPELLANT.

319 N.W.2d 741

Filed May 21, 1982.   No. 44390.

James G. Egley of Moyer, Moyer & Egley, for appellant.

Tedd C. Huston, P.C., for appellee.

Heard before McCOWN, HASTINGS, and CAPORALE, JJ., and STUART and HIPPE, D. JJ.

HASTINGS, J.

The District Court granted the application of petitioner, Thomas P. Dunne, to transfer physical custody of the parties' two children from the respondent, Martha F. Dunne, to him.  The respondent has appealed.

The two children are Matthew, born November 15, 1970, and Melissa, born May 1, 1973. Matthew, the natural child of respondent, was adopted by petitioner, and Melissa is a child of the marriage. The decree dissolving the marriage was entered on October 29, 1975. Legal custody of the children was retained in the court, but physical custody was granted to the respondent. On March 15, 1977, petitioner filed an application for modification of the decree, alleging that respondent "had been consorting with one Rick Thorman," and, further, that petitioner, after having been convicted of drunk driving, committed himself for alcohol treatment, and because of that treatment asked that his child support payments be reduced from the court-ordered $250 per month. Some 7 days later, he filed an additional application, alleging that respondent was pregnant and unmarried, and asked that custody of the children be placed with him. Pursuant to a written stipulation signed by the parties, the court entered an order on July 11, 1977, reducing the child support to $150 per month for both children, and continued physical custody in the respondent.

The application to modify the custody arrangements which precipitated this appeal was filed on December 19, 1980. It alleged that respondent had increased her consumption of alcohol, that the children were not properly fed or clothed and were living in unsanitary conditions, and that the respondent had taken up residence with Rick Thorman to whom she was not married and who was an excessive user of alcohol.

Following a 2-day trial, the court entered an order dated April 9, 1981, finding that "the home of the Respondent, Martha F. Dunne, who is living with Rick Thorman as man and wife without having become married, is an immoral and illegal atmosphere to raise the minor children and that the Respondent is unfit to have the care, custody and control of said

minor children . . . ." The court then awarded physical custody to the petitioner, with reasonable rights of visitation in the respondent. A supersedeas bond has been posted by the respondent.

In domestic relations cases the rule is, and always has been, that on appeal to this court we must try the issues de novo. We are required to make independent conclusions of fact without reference to the conclusion reached by the trial court. However, we will give weight to the fact that the trial court observed the witnesses and their manner of testifying, and accepted one version of the facts rather than the opposite. *Schuller v. Schuller,* 191 Neb. 266, 214 N.W.2d 617 (1974).

The areas of concern raised by the pleadings and evidence in this case include not only the respondent and Mr. Thorman's living arrangement and marital status but also their use of alcohol, the physical atmosphere of the residence in which the children reside, and the children's health care, education, and religious training.

Without setting forth the evidence in great detail, it can be said that the petitioner has enjoyed the status of a recovered alcoholic during the past 5 years. He is engaged in the hardware and plumbing business in Taylor, Nebraska, and is considered a stable businessman with a good reputation in the community. He is single and resides with his 60-year-old mother, a schoolteacher in the local schools. He apparently works 6 days a week, and during the times of his visitations with the children, it has been his mother who devotes most of the time to their care. She owns a rather large, comfortable, family-type house in Taylor.

The testimony of the respondent and Thorman discloses that his recovery from alcohol abuse was of much shorter duration than that of the petitioner, having begun for the second time some 2 to 3 months prior to the hearing in this matter, and, consequent-

ly, the results of that treatment are not yet assured. He had completed a course of treatment at Valley Hope, and some years earlier had undergone similar treatment at the VA Hospital in South Dakota. There is no substantial evidence of present alcohol abuse on the part of respondent, although she has been known to drink on occasions.

Steven O. Stumpff, a practicing attorney in Broken Bow and the court investigator in the original dissolution proceedings between the parties, was appointed by the court to investigate the entire situation of both parties at this time relating to the welfare of the children. He made a thorough investigation, which included at least two inspections of the respondent's home and interviews with a number of witnesses. His first contact with the respondent at her home on this investigation occurred on February 13, 1981, and was unannounced. He described the kitchen as "filthy." There were dirty dishes all over, and he thought he detected the odor of spoiled food. The living room was dirty and the dining room cluttered, but nothing like the kitchen. The rest of the house, including the bathroom and bedrooms, was "clean as a whistle." A search was made particularly for liquor or beer containers, but none were found. On a subsequent prearranged visit to the respondent's home on March 13, 1981, the house was found to be "spic and span."

Mr. Stumpff's visit with several of the respondent's friends confirmed the fact that respondent's house was generally a mess, and that the respondent and Thorman spent a lot of time around the Hungry Horse Saloon before Thorman went for treatment.

An investigation into the home maintained by the petitioner's mother disclosed that she maintained a very nice home which would be adequate for raising the children.

Mr. Stumpff also learned certain facts relating to the health of the children from the petitioner's

mother. After talking to the family's physician and dentist, however, Mr. Stumpff concluded that the children were receiving adequate medical treatment. It should be noted, however, that Melissa's teeth were in terrible condition, and that Matthew had not been examined as of yet by that particular dentist.

An interview by Mr. Stumpff with the children's two schoolteachers disclosed that Matthew was probably the best student in his class, and, although he was not very clean at the beginning of the school year, all of that had changed about Christmastime. Melissa's teacher reported that she knew the house where the children lived was very untidy, but that Melissa came to school clean and neat, and was a very lovable child who was an average to above average student.

Finally, Mr. Stumpff also had the opportunity to visit with each child privately. Both children expressed the desire to remain with their mother and the rest of the family. They also said that they enjoyed the visitations with their father, although Matthew complained that he did not get enough time with his father on those visits.

The investigation also revealed that the respondent had been employed as a cook at the Hungry Horse Saloon for from 3 to 5 nights per week. It was learned that Mr. Thorman worked at the Thunderbolt Ranch as a skilled workman, welding and erecting steel. The babysitting was done by a neighbor girl who seemed adequate for the job.

The interview with Thorman revealed that he appeared to be a hard worker, that he loved the children, and that he had had financial problems in the past. Thorman also stated that while he had had problems with drinking and drunken driving, he felt that he had the drinking problem controlled. He was currently making $8 per hour on his job but was expecting a promotion to maintenance supervisor on

the first of May 1981, which paid $9 per hour.

An interview with the sheriff disclosed that on September 28, 1980, he was involved in a minor incident with the respondent and Thorman and he believed that both were intoxicated at the time. He went on to say that although he believed the respondent and Thorman spent quite a bit of time at the Hungry Horse Saloon before Thorman went to treatment, he was satisfied that they were no longer doing that except for the time necessary for respondent to discharge her employment obligations.

At least two witnesses testified to having seen the respondent with a number of other women on one particular evening at the Starlight Lounge in Ord, Nebraska, having a drink.

Information obtained from two bankers in Taylor, Nebraska, revealed that the petitioner enjoyed a good reputation as a stable person. The head of the local chapter of Alcoholics Anonymous revealed that the petitioner was getting along fine and had just received his 5-year no-drinking pin.

According to the testimony of the petitioner, he was a chronic alcoholic, and, following an arrest for second offense DWI, he elected to seek treatment as an alternative to a jail sentence, and has had nothing to drink since that time.

The petitioner also testified to the fact that he had made an unannounced and unauthorized inspection of the respondent's house on October 31, 1980, where he said he discovered a dirty kitchen with food left in a skillet, the odor of spoiled food in the refrigerator, and the smell of alcohol in the house, with several empty beer cans and an empty vodka bottle present. He took several pictures, including one which showed the beer cans and vodka bottle among the many dirty dishes and kitchen utensils. Although he denied the fact on several occasions during the course of his testimony, he finally admitted that he had "staged" this picture by arranging the beer

cans and the vodka bottle himself. As a consequence, his lawyer withdrew the pictures from evidence.

The petitioner also provided some additional information concerning the children's health care by relating an incident that occurred during the first or second week of August when the children came to visit and had medicine for scabies which their mother had sent along. He further alleged that the children had informed him that the respondent had also had scabies. There was also some evidence offered by the grandmother that the children had always needed a bath when they came to visit, until the papers in connection with this last hearing were served.

Regarding the matter of scabies, the respondent testified that all of the parents received a letter from the Ericson schools which stated that scabies was going around. Moreover, she noted that, according to her doctor, neither she nor the children had actually had scabies. She also stated that the children were bathed every night.

Regarding the various other matters raised by the petitioner, the respondent testified that Mr. Thorman does not drink at all now, and that although she does drink on occasion, she does not drink at home. She also noted that she attends church and the children go to Sunday School, although this happens less frequently since they have moved to Ericson. She also noted that she has attended almost every school function to which parents have been invited. By contrast, the respondent claims that the petitioner never goes to church, never takes the children to Sunday School, and has attended only one school function. Finally, the respondent noted that she believes neither the people in the community nor the children know that she and Thorman are not married. Furthermore, she claims that they intend to get married and had planned to do so on two occa-

sions, but that on one occasion one of the children got sick and the other time a court hearing interfered.

In attempting to apply the law to the facts of this case, we should emphasize at the outset that, contrary to the finding of the trial judge, we are aware of no statute, at least, which would declare the living arrangement in which the children are residing an "illegal atmosphere." Neb. Rev. Stat. § 28-928 (Reissue 1975), which did make it a misdemeanor for unmarried persons to live in a state of fornication, was repealed, effective January 1, 1979, as a part of the newly adopted Nebraska Criminal Code. There remains for consideration, however, whether the arrangement creates an "immoral atmosphere."

We have said a number of times that sexual misconduct, although not necessarily determinative of the issue of child custody, is a factor which may be considered in deciding that issue. *Ahlman v. Ahlman,* 201 Neb. 273, 267 N.W.2d 521 (1978). Although we hesitate to attempt to "color match" cases, it may be helpful to quote in some detail from *Ahlman.* "Arlene [mother] had exposed the children to an immoral and improper atmosphere by cohabiting with Greg and bearing an illegitimate child . . . Arlene had used marijuana in her home when the children were present and permitted a minor to use that substance in her home; Arlene had failed to provide religious training for the children and failed to properly provide for their medical and dental care; Greg had an unstable employment record and had not contributed to the stability and fitness of Arlene's home; Nathan [father] had provided religious training for the children and is able to provide proper medical and dental care . . . Nathan's home is a more stable, fit, and secure home for the children than is Arlene's home." *Id.* at 276, 267 N.W.2d at 523. This court went on to state: "Although any one of the factors relied on by the trial court, stand-

ing alone, might not be sufficient to warrant a change in custody, viewed together we believe that they support the conclusion of the trial court." *Id.* at 278, 267 N.W.2d at 524.

The petitioner places a great deal of reliance upon the case of *Marts v. Marts,* 206 Neb. 38, 290 N.W.2d 816 (1980), and refers to the following language: "We conclude on independent examination of the record that there has been a change in circumstances in the deteriorating lifestyle of Shelley [mother], detrimental to the environment of a child of Heather's age, whereas Robert's attitude as a father has matured and improved to the point where it is fairly obvious that he is in a position to provide a more stable and natural home life for Heather at this time." *Id.* at 41-42, 290 N.W.2d at 818. However, in reaching that conclusion, we considered the fact that the mother had made frequent moves around the country as well as within the city; her illicit relations were neither stable nor exclusive; she was interested in the theater as a career, as was her then current boyfriend; and she admitted that further travels might be necessary to further that career. The child involved was found to be somewhat independent and adult-oriented, a result of little if any contact with children of her own age.

Additional factors to be considered on the issue of child custody are the "desires and wishes of the children if of an age of comprehension . . . when such desires and wishes are based on sound reasoning . . . ," Neb. Rev. Stat. § 42-364 (Reissue 1978), and the emotional relationship between the children, their parents, and siblings, as well as the effect of continuing or disrupting an existing relationship. *Moninger v. Moninger,* 202 Neb. 494, 276 N.W.2d 100 (1979).

We must also remember that orders fixing custody of minor children will not be modified unless there has been a change of circumstances indicating

that the person who has custody is unfit for that purpose or that the best interests of the child require such action. *Swearingen v. Swearingen,* 201 Neb. 255, 267 N.W.2d 514 (1978). There is considerable doubt in our minds that there has been any change in circumstances since 1977, at least in regard to the chief complaint of cohabitation, when the petitioner stipulated and the trial court ordered that there be no change in the custody arrangement except that the petitioner's responsibility for child support should be decreased.

We do not approve of the lifestyle pursued by the respondent. If there were other significant factors deleteriously affecting the welfare of these children, we would have no hesitancy in approving the removal of these children from the respondent's household. However, the charges of neglect seem to be without substance. The apparent slovenly housekeeping on the part of the respondent is regrettable, but hardly grounds for a change of custody. The children seem to be well adjusted, happy, healthy, and loved, with a genuine desire to remain with their mother and younger siblings. As we so recently stated in *Krueger v. Krueger, ante* p. 568, 574-75, 319 N.W.2d 445, 448 (1982): "We are convinced that the best interests of [these children] will not be served by constant custody disputes and a shifting of physical custody and control from one parent to the other."

The judgment of the District Court is reversed and the cause is remanded with directions to that court to continue physical custody in the respondent, but immediately to implement its original order that such custody be "subject to the strict supervision of the Loup-Garfield Division of Public Welfare," with the requirement that that agency conscientiously report to the court on a regular basis its findings in the areas about which complaints have been made.

REVERSED AND REMANDED WITH DIRECTIONS.

STUART, D. J., dissents.