JACQUELINE L. HAAKE, APPELLANT, V. STACY L. HAAKE, APPELLEE.

341 N.W.2d 911

Filed December 9, 1983. No. 83-162.

Daniel E. Wherry of Johnson, Barber, Wherry & Knight, for appellant.

Michael E. Willet of Everson, Noble, Wullschleger, Sutter, Sharp, Korslund & Willet, for appellee.

BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

GRANT, J.

This is an appeal by the petitioner-appellant, Jacqueline L. Haake, now Jacqueline Woltemath, from an order of the District Court changing custody of her two minor children to her former husband, respondent-appellee herein, Stacy L. Haake. The parties were married in May of 1970 when Jacqueline was 16 and Stacy was 19, and they had two children: a son, Shannon, born December 22, 1970, and a daughter, Stashia, born January 22, 1975.

Jacqueline filed this action seeking dissolution of the marriage, custody of the two children, and a division of property. Stacy cross-petitioned seeking the same relief, except for his request that he have custody of Shannon while Stashia's custody be given to Jacqueline. The case was tried on all issues. The court entered its decree on March 8, 1982, dissolving the marriage, disposing of the parties' interest in their real and personal property, and granting temporary physical custody of Stashia to her mother and of Shannon to his father, and setting a further hearing "to determine the final placement of custody" for July 1, 1982.

No appeal was taken from this decree. On August 2, 1982, a further hearing on custody was held. On August 23, 1982, the court, by its order, found both parties fit and proper persons to have custody and awarded custody of both children to their mother, Jacqueline.

On September 22, 1982, respondent Stacy filed his application to modify the decree as to custody, alleging that Jacqueline had removed the minor children from Nebraska, that there had been a change of circumstances, and that the best interests of the children would be served if their custody was given

)

to Stacy. On November 4, 1982, Jacqueline filed her application to modify the decree to authorize her to remove the children to Wyoming because of her remarriage and her move to Wyoming to make her permanent home.

Hearing was held on both applications on January 28, 1983. By order signed February 9, 1983, the trial court modifed its earlier custody orders and gave physical custody of both children to Stacy. The court found "that there has been a change in circumstances since the hearing held in the matter on August 2, 1982; that the physical custody of the minor children . . . should be placed with Respondent herein." There were no findings as to the fitness or unfitness of either parent. Jacqueline was ordered to pay child support of $125 per month per child and was given generous summer and holiday visitation. Jacqueline appeals from this order changing custody.

In actions such as this, seeking modification of the trial court's order as to custody of children in a dissolution of marriage case, on appeal this court must review de novo the determinations of the trial court with regard to whether a change in circumstances has occurred which justifies the modification of the earlier custody order. We are required to make independent conclusions of fact without reference to the conclusion reached by the trial court, recognizing, however, that we will give weight to the fact that the trial court observed the witnesses and has accepted one version of the facts rather than the opposite. *Dunne v. Dunne*, 211 Neb. 636, 319 N.W.2d 741 (1982).

Acting within that scope of review, and giving appropriate weight to the fact that the trial court did observe the witnesses, we determine that the trial court erred in changing custody, and we therefore reverse.

The parties agree that in determining the question of who should have the care and custody of the chil-

dren in a modification hearing, the paramount consideration is the best interests of the children. *Kuhn v. Kuhn*, 204 Neb. 363, 282 N.W.2d 43 (1979); *Dunne v. Dunne, supra.*

The undisputed facts before the trial court showed that after Jacqueline filed her petition for dissolution, she had no money and moved with her two children into the home of her friends, Brad and Cindy Woltemath. The Woltemaths were in the process of getting a dissolution of their marriage, but for reasons of economy continued to live in the same house. Cindy Woltemath was Jacqueline's best friend, and both Cindy and her husband agreed to the arrangement. Jacqueline paid for her living costs, and she testified that "we just lived together as friends and family and shared the expenses." The arrangement was necessary, according to Jacqueline, because no one, including her parents or her husband, was supportive of her, although her husband did pay her support during this time. In this same year of 1981 Stacy earned wages of over $21,000, had interest income of over $11,000, and gross farm income of $51,649 (resulting in a net loss in farm income of $13,188). The great portion of the income was spent on the purchase of the farm the parties were living on. This apparently was the prime source of the parties' marital difficulty. Jacqueline described the situation: "I was physically drained, and I just couldn't handle any more work. The farm began to be just more than I could handle, and if — all Stacy wanted to do was buy another farm and I just couldn't — There just was noway [sic] we could do any more than we were already doing."

Jacqueline had not precipitated the filing of the Woltemath divorce, nor was she a precipitating factor in its conclusion. On September 1, 1981, Jacqueline moved to Wyoming with Brad Woltemath and with Stashia. Shannon remained with his father, both due to the fact he was already enrolled in a Nebraska school which was helping his slight learning

disability and because of Stacy's insistence. Jacqueline obtained a job with Brad Woltemath as the two-person management team of a portion of a 200,000-acre Wyoming ranch. They lived together and Stashia lived with them. There was never any sexual activity in the presence of the children.

Shannon lived with his father at the time. Stacy was then working a full-time 8-hour job, and was farming. He had to leave for work each morning about 5:30 a.m., and would return about 5 p.m. His farming work was done after 5 p.m. and on weekends. Shannon would get up with an alarm clock, go to school, and return to a neighbor's home.

All of the above facts were testified to before the trial judge in the February 1982 trial. By its decree of March 8, 1982, the court found that Jacqueline was a fit and proper person to have physical custody of Stashia and that Stacy was a fit and proper person to have physical custody of Shannon. These custody orders were made subject to a later hearing set for July 1, 1982.

In April of 1982 the trial court ordered Stacy to allow Shannon to visit his mother in Wyoming.

Although not reflected in its formal findings, after the conclusion of the February dissolution hearing, the trial court noted that while both parties were fine people, the court was dissatisfied with Jacqueline's living in Wyoming, and was dissatisfied with Stacy in that the court saw no way a man could "drive 120 miles a day, work an eight-hour shift, farm 320 acres and properly raise a child . . . ." The court then gave each parent temporary physical custody of the child then with that parent.

Further hearing on custody was held in August of 1982. Evidence at that time showed that Jacqueline had moved back to Lincoln, Nebraska, on June 15, 1982, after school was out in Wyoming. Shannon had gone to Wyoming on June 7 and moved back with Jacqueline and Stashia. On her return Jacqueline first lived with her 78-year-old grandfather, but the

children were a little too much for him, and after 2 weeks she moved into a mobile home. At the time of the hearing she testified that she was satisfied with the housing. Jacqueline got a job in the retail florist department of a grocery store at $3.50 per hour. Jacqueline further testified that she had "no present plans with Brad Woltemath as of right now."

Stacy testified that he was still working at his job and his other living arrangements had not changed much. After the hearing the court determined that both parents were fit and proper persons to have custody, and gave physical custody of both children to Jacqueline.

Further hearing on the custody issue was held in January 1983 pursuant to the applications of both parties, as set out above. Evidence at this hearing showed that Stacy had, with court permission, taken over custody of both children in December 1982 and that both children were in school in Nebraska. Stacy had been injured on his job on June 25, was on disability until August 18, 1982, and had not been recalled to work. He was farming. Stacy further testified that he had received a letter from Jacqueline on September 14, 1982, telling him that she had married Brad Woltemath and had moved the children to Wyoming.

Jacqueline testified that while, on August 2, 1982, she had testified that she had no plans to remarry, she did decide to marry Brad Woltemath about September 8 and actually married him on September 19, 1982.

She further testified that her former employers in Wyoming had reoffered her former job to her and that she and Brad Woltemath were again managing the ranch. Brad Woltemath testified as to the marriage, the job situation, and the fact he knew and could help care for the two children. Jacqueline's employer testified, in person, that Jacqueline and Brad cared for a 10,000-acre ranch, which was a por-

tion of the employer's overall operation, and that they had basically done so since September 1981. The employer stated that the two were impressive people and that the employer wanted and needed them in the ranch operation. The employer also testified that Jacqueline was a fine homemaker (the employer had "never seen anyone so talented") and a good mother.

An educational diagnostician and a teacher from Newcastle, Wyoming, both testified by deposition as to the programs available in Wyoming for Shannon's type of learning disability and that Shannon had done very well in that program while in Wyoming.

The guardian ad litem appointed for the children also testified. His investigation showed that he felt Shannon's learning disability was slight and existed only in the areas of visual discrimination and memory. He testified the schooling opportunities were substantially similar in both Nebraska and Wyoming. The guardian further testified that both parents love the children but that Stacy needed some parent counseling to improve his parental and communication skills. He further testified that both children told him they wanted to be with their mother in Wyoming but that he had the feeling they were somewhat coached.

The trial court did not interview the children. As set out above, the court did not make any further finding after the January 1983 hearing as to the fitness of the parties. The facts, then, as presented in the record, show that physical custody had been given to Jacqueline while she was living in a small mobile home in Lincoln, earning $3.50 per hour, and working many hours, due to both the demands of her job and her need for money. The change in circumstances is that she has moved to Wyoming and married the man with whom she had been living.

In Wyoming she can provide the same home which the court found satisfactory when giving her custody of Stashia. Jacqueline has stabilized her relation-

ship with Brad Woltemath by marrying him. The court had not disapproved Stashia's living in the residence of Jacqueline and Brad even before they married. And most of all, she can furnish to Shannon the type of personal, loving parenting that he seems to need as he progresses through his schooling. It is unfortunate that Stacy cannot provide such personal help because of the demands on him to earn his living, but that is the fact.

We appreciate the fact that the court felt it had been taken advantage of in Jacqueline's sudden marriage decision and decision to live in Wyoming. When the comparison is made, however, between living in a small mobile home and working at minimum wages for long hours and living in the ranch atmosphere available in Wyoming, we find that there is not a sufficient change in circumstances to change custody. As stated in *Dunne v. Dunne*, 211 Neb. 636, 644-45, 319 N.W.2d 741, 745 (1982), "We must also remember that orders fixing custody of minor children will not be modified unless there has been a change of circumstances indicating that the person who has custody is unfit for that purpose or that the best interests of the child require such action."

The trial court's concern with the visitation aspect of a custody order when the custodial parent is to live outside the state is well founded. We have stated, " 'In a divorce case it is generally the best policy to keep minor children within the jurisdiction of the court. However, the welfare of the child should receive the paramount consideration in the determination thereof and this policy should yield to the best interests of the child.' " *Campbell v. Campbell*, 156 Neb. 155, 159, 55 N.W.2d 347, 350 (1952), quoted with approval in *Jafari v. Jafari*, 204 Neb. 622, 284 N.W.2d 554 (1979). In *Jafari, supra* at 624, 284 N.W.2d at 555, we further stated, "The general rule in cases where a custodial parent wishes to leave the jurisdiction for any legitimate reason is

that the minor children will be allowed to accompany the custodial parent if the court finds it to be in the best interests of the children to continue to live with that parent.''

We find that the best interests of the children require that the children remain in the custody of their mother in the State of Wyoming and that the court erred in changing custody of the children after its January 1983 hearing. The provisions of the trial court's order of February 9, 1983, should be reversed, and the trial court is directed to enter an order giving custody of the children to petitioner, Jacqueline, beginning January 3, 1984; to require respondent to pay $125 per child per month, beginning January 3, 1984; and to provide a visitation period of 8 weeks each summer to respondent, along with appropriate alternate holiday visitation after January 1984. We further note that there should be no retention of custody in the court.

REVERSED AND REMANDED WITH DIRECTIONS.